# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ABINGDON DIVISION

| | | |
|---|---|---|
| **SANDRA ALDERMAN,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:10CV00068 |
| | ) | |
| v. | ) | **OPINION** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | By: James P. Jones |
| **COMMISSIONER OF** | ) | United States District Judge |
| **SOCIAL SECURITY,** | ) | |
| | ) | |
| Defendant. | ) | |

*Ginger J. Largen, Morefield & Largen, PLC, Abingdon, Virginia, for Plaintiff; Eric P. Kressman, Regional Chief Counsel, Region III, Heather Benderson, Assistant Regional Counsel, and Allyson Jozwik, Special Assistant United States Attorney, Office of the General Counsel, Social Security Administration, Philadelphia, Pennsylvania, for Defendant.*

In this social security case, I affirm the final decision of the Commissioner.

I

Plaintiff Sandra Alderman filed this action challenging the final decision of the Commissioner of Social Security (the "Commissioner") denying her claims for disability insurance benefits ("DIB") pursuant to Title II of the Social Security Act ("the Act"), 42 U.S.C.A. §§ 401-433 (West 2003 & Supp. 2010). Jurisdiction of this court exists pursuant to 42 U.S.C.A. §§ 405(g).

Alderman filed for benefits on September 14, 2007, alleging she became disabled on November 21, 2006, due to chronic fatigue. Her claim was denied initially and upon reconsideration. Alderman received a hearing before an administrative law judge ("ALJ"), during which Alderman, represented by counsel, and a vocational expert testified. The ALJ denied Alderman's claim, and the Social Security Administration Appeals Council denied her Request for Reconsideration. Alderman then filed her Complaint with this court, objecting to the Commissioner's final decision.

The parties have filed cross motions for summary judgment and have briefed and argued the issues. The case is ripe for decision.

II

Alderman was born on September 15, 1964, making her a younger person under the regulations. 20 C.F.R. § 404.1563(c) (2010). Alderman has a high school education. She has worked in the past as a utility line repair person for Volvo.

In March 2006, Alderman sought treatment for complaints of pain in her feet, legs, back, knees, neck, and shoulder. Richard L. Wilson, M.D., opined that Presley might have been taking too much medication. A physical examination

showed normal range of motion, sensation, and reflexes. Dr. Wilson prescribed Diclofenac and Lyrica.

Dr. Wilson's notes reflect that in April 2006 Alderman was unable to fill her Lyrica prescription because of insurance issues and that Diclofenac was upsetting her stomach. Dr. Wilson prescribed Lortab on an as-needed basis and advised Alderman to keep a pain diary. Later that month, Alderman reported that she was taking Lortab five times per day. She was sleeping well and maintaining her activities. Dr. Wilson opined that Alderman's condition was stable and that she would do well if she maintained on her medication. In June 2006, Alderman reported to Dr. Wilson that she was able to maintain her activities, and Dr. Wilson noted that she was looking well and moving well.

In September 2006, Alderman returned to Dr. Wilson complaining of bilateral foot pain, in addition to her chronic back pain. Dr. Wilson diagnosed bilateral plantar fasciitis and advised Alderman to use arch supports and insoles. Her condition was stable in November 2006.

In March 2007, Alderman reported to Dr. Wilson that she was doing well but had been fired from her job. Dr. Wilson noted that Alderman seemed to take no responsibility for her firing. Alderman complained of arm pain, which was consistent with triceps tendonitis. Dr. Wilson prescribed Relafen. At a follow-up appointment in May 2007, Alderman reported that her back pain was well

controlled with her medications. She also reported that she never got her prescription for Relafen filled. Dr. Wilson noted that Alderman looked well and was moving well without difficulty. In August 2007, Alderman continued to do well, as noted in Dr. Wilson's notes, and she reported that she was doing "odd jobs." (R. 196.)

In October 2007, Alderman reported that she was doing relatively well but had some difficulty with her arm and neck. She also reported that she could no longer afford her anti-inflammatory medications. Dr. Wilson reported that Alderman's condition was stable and relatively normal despite her subjective complaints. Dr. Wilson's notes indicate that Alderman asked about receiving disability benefits. He noted that Alderman's complaints were largely symptomatic with few underlying physical findings and that he was not convinced that she was a good candidate for disability.

In December 2007, Alderman complained to Dr. Wilson about stress, insomnia, and crying spells. She was on Lortab, Celexa, Celebrex, and allergy medication, but Dr. Wilson was unsure about how much of the medication Alderman was taking due to financial trouble. He gave her samples of Celebrex and renewed her prescription for Lortab. Alderman reported that she was having difficulty finding a job for which she was qualified and therefore wanted to pursue obtaining Social Security disability benefits. Dr. Wilson opined that her subjective

pain syndrome should not have necessarily been disabling. He also opined that Alderman's "current level of disability is supratentorial and educational deficit more than the physical abnormality that I can ascertain." (R. 214.)

A few days later, Alderman sought treatment at Mount Rogers Community Services Board with counselor Jim Blair. She reported symptoms of depression, withdrawal, low energy, difficulty concentrating, excessive sleeping, sadness, and worrying. He diagnosed depressive disorder, not otherwise specified, and assigned a global assessment of functioning ("GAF") score of 65.[1]

Joseph Duckwall, M.D., a state agency physician, reviewed Alderman's medical records on December 12, 2007. He opined that Alderman was capable of performing a full range of medium work. She missed her first two scheduled counseling sessions with Blair but met with him in February 2008. Alderman reported a fair level of stability but continued to experience episodes of depression, difficulty concentrating, and remembering things when under stress. In March 2008, Alderman reported that financial stressors caused episodes of depression, sleep disturbance, and feelings of hopelessness at times.

---

[1] The GAF scale is a method of considering psychological, social and occupational function on a hypothetical continuum of mental health. The GAF scale ranges from 0 to 100, with serious impairment in functioning at a score of 50 or below. A score in the 61 to 70 range indicates that the patient has some mild symptoms or some difficulty in social, occupational, or school functioning but that she is generally functioning pretty well and has some meaningful interpersonal relationships. Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 1994).

Alderman saw Dr. Wilson in March 2008. She reported that she was doing well on her medications but had some bilateral finger numbness. Dr. Wilson noted that she had good grip strength, normal muscle bulk, and no wasting between the bones. He opined that Alderman might have been suffering from early carpel tunnel symptoms and advised that she wear a wrist brace.

In May 2008, Frank M. Johnson, M.D., a state agency physician, reviewed Alderman's medical records and determined that she was capable of performing a full range of medium work. Joseph I. Leizer, Ph.D., a state agency psychologist, reviewed Alderman's medical records and determined that she did not have a severe mental impairment.

In November 2008, Alderman sought treatment from W. Matthew Skewes, M.D., a primary care physician, for aching that she attributed to fibromyalgia. Dr. Skewes diagnosed fibromyalgia and degenerative disc disease. In January 2009, Dr. Skewes referred Alderman to Joseph P. Lemmer, M.D., a rheumatologist, for evaluation of her complaints of generalized myalgias and arthralgias. She reported to Dr. Lemmer that she had aches and pains for the past 10 years and that her pain was aggravated by overdoing, stress, and cold weather. She also told Dr. Lemmer that her pain was helped somewhat with Lortab, stretching, and Soma. Dr. Lemmer performed a physical examination and found normal results except for mild tenderness in portions of the back, neck, elbows, and knees. He also found

minimal bony enlargement of the finger joints, and imaging revealed mild disc disease in the neck and back. Dr. Lemmer diagnosed generalized myalgias and arthralgias with tender points most consistent with fibromyalgia, anxious depression with sleep disturbance and fatigue, mild early osteoarthritis of the fingers, and mild radiographic cervical and lumbar spondylosis that was probably asymptomatic. He recommended massage, heat, and stretching and prescribed Zanaflex and Neurontin. He also encouraged Alderman to stop smoking and to minimize her use of caffeine.

In January 2009, Lori Burton, a counselor at Mount Rogers Community Services Board, conducted an annual clinical assessment update. Burton diagnosed depressive disorder, not otherwise specified. She rated Alderman's GAF score at 55[2] and noted that Alderman's highest GAF for the year was 65. She recommended that Alderman receive adult mental health case management. During case management phone calls made in early 2009, Alderman reported that her moods fluctuated but she had no suicidal or homicidal ideation.

In February 2009, Dr. Skewes completed an assessment of Alderman's pain. He circled choices on the assessment form indicating that Alderman's pain was distracting so as to prevent adequate performance of daily activities or work, that

---

[2] A GAF score in the 51 to 60 range indicates some moderate symptoms or moderate difficulty in social, occupational, or school functioning. Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 1994).

physical activity greatly increased her pain and caused abandonment of tasks, and that medication would severely limit Alderman's effectiveness at work due to distraction, inattention, and drowsiness.

In March 2009, Alderman returned to Dr. Lemmer, who continued Alderman's medication but added Flexeril and, temporarily, Lortab. Dr. Lemmer completed an assessment of Alderman's pain and physical abilities. He opined that Alderman was capable of sitting, standing, or walking for two hours at a time and for four hours in an eight-hour workday. He opined that she should never lift or carry more than 20 pounds and that she could not use her hands or feet for repetitive action. Dr. Lemmer indicated that Alderman's pain would cause distraction that would prevent adequate performance of daily activities or work and that physical activity would increase her pain and cause abandonment of tasks. He also opined that Alderman's medication would limit her work ability but would not create serious work problems. Dr. Lemmer further indicated that Alderman would have difficulty with repetitive tasks.

After reviewing Alderman's records, the ALJ determined that she had several severe impairments: back pain and a history of degenerative disc disease, fibromyalgia and other unspecified arthralgias, and depression associated with pain. However, the ALJ found that none of these conditions, either alone or in combination, met or medically equaled a listed impairment.

Taking into account Alderman's limitations, the ALJ determined that Alderman retained the residual functional capacity to perform light work that required no more than six hours of sitting in an eight-hour day; no more than six hours of standing or walking in an eight-hour day; no more than occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching, and crawling; no climbing of ladders, ropes, or scaffolds; no work around hazardous machinery, at unprotected heights, or on vibrating surfaces; and no exposure to extremely cold temperatures. The ALJ also noted that Alderman's mental impairments further limited her to simple, routine, repetitive, unskilled tasks. The vocational expert testified that someone with Alderman's residual functional capacity could work as a survey worker, a price changer, or an information clerk. The vocational expert testified that there are over 500,000 of these positions in the national economy. Relying on this testimony, the ALJ concluded that Alderman was able to perform work that existed in significant numbers in the national economy and was therefore not disabled under the Act.

Following the ALJ's unfavorable decision, Alderman requested review and submitted additional evidence to the Appeals Council for consideration. This evidence consisted of medical records from appointments with Dr. Lemmer, Dr. Skewes, and a counselor at Mount Rogers Community Services Board. The Appeals Council denied review.

Alderman argues the ALJ's decision is not supported by substantial evidence because the ALJ did not consider the combined effect of Alderman's impairments, improperly discounted the opinion of Dr. Lemmer and Dr. Skewes, and failed to present a proper hypothetical question to the vocational expert. For the reasons below, I disagree.

### III

The plaintiff bears the burden of proving that she is under a disability. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). The standard for disability is strict. The plaintiff must show that her "physical or mental impairment or impairments are of such severity that [s]he is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C.A. § 423(d) (2) (A).

In assessing DIB claims, the Commissioner applies a five-step sequential evaluation process. The Commissioner considers whether the claimant: (1) has worked during the alleged period of disability; (2) has a severe impairment; (3) has a condition that meets or equals the severity of a listed impairment; (4) could return to her past relevant work; and (5) if not, whether she could perform other work present in the national economy. *See* 20 C.F.R. §§ 404.1520(a)(4), (2010).

If it is determined at any point in the five-step analysis that the claimant is not disabled, the inquiry immediately ceases. *Id.*; *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The fourth and fifth steps of the inquiry require an assessment of the claimant's residual functional capacity, which is then compared with the physical and mental demands of the claimant's past relevant work and of other work present in the national economy. *Id.* at 869.

In accordance with the Act, I must uphold the Commissioner's findings if substantial evidence supports them and the findings were reached through application of the correct legal standard. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation marks and citation omitted). Substantial evidence is "more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). It is the role of the ALJ to resolve evidentiary conflicts, including inconsistencies in the evidence. *Seacrist v. Weinberger*, 538 F.2d 1054, 1956-57 (4th Cir. 1976). It is not the role of this court to substitute its judgment for that of the Commissioner. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).

Alderman asserts that the ALJ's decision was not supported by substantial evidence. She presents three arguments.

First, she argues that the ALJ failed to consider Alderman's impairments in combination. However, there is nothing in the record to indicate that the ALJ erred. The ALJ determined a residual functional capacity that included both physical and mental limitations and presented those limitations to the vocational expert. The vocational expert who testified at the hearing considered those limitations and suggested jobs that would accommodate Alderman's impairments.

Second, she argues that the ALJ improperly discounted the assessments completed by Dr. Lemmer and Dr. Skewes, two of Alderman's treating physicians. Dr. Lemmer and Dr. Skewes found that Alderman suffered from fibromyalgia, degenerative disc disease, and pain in her neck, shoulder, and back. They each completed assessments of Alderman's pain and opined on the limitations caused by her impairments. Both doctors opined that Alderman's pain was distracting and was exacerbated by walking, standing, and bending. Dr. Lemmer, particularly, completed an evaluation of Alderman's physical capacity and opined that she could only sit, stand, or walk for two hours at a time and for four hours total during an eight-hour day. He also opined that she could not do simple grasping, pushing, or pulling with either hand.

A treating physician's medical opinion will be given controlling weight when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in

[the] case record." 20 C.F.R. §§ 404.1527(d)(2) (2010). However, the ALJ has "the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001).

In the present case, the ALJ considered the opinions of Dr. Lemmer and Dr. Skewes but gave little weight to the assessments, for several reasons. First, the checklists used were not accompanied by a rationale for the opinion or reports of clinical findings supporting the opinions. Second, the opinions were inconsistent with the doctors' mild findings and with the conservative treatment measures. The options were also inconsistent with the findings of state agency consultants. Notably, the ALJ did afford some weight to the medical opinions of Alderman's treating physicians; he limited Alderman to light work and imposed several functional limitations. The decision was supported by substantial evidence.

Finally, Alderman claims that none of the hypothetical questions posed to the vocational expert at the hearing properly outlined all of Alderman's physical limitations. Because the residual functional capacity determined by the ALJ was supported by substantial evidence, this claim is without merit.

IV

For the foregoing reasons, the plaintiff's Motion for Summary Judgment will be denied, and the defendant's Motion for Summary Judgment will be granted. A final judgment will be entered affirming the Commissioner's final decision denying benefits.

DATED: August 17, 2011

/s/ James P. Jones
United States District Judge